Norma GALES, Plaintiff,

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**No. Civ.A. 98–0401(JR).**

United States District Court, District of Columbia.

April 27, 1999.

William C. Claiborne III, Washington, DC, for plaintiff.

Michael Stern, Assistant Corporation Counsel, D.C., Washington, DC, for defendants.

## MEMORANDUM

ROBERTSON, District Judge.

In this action brought pursuant to 42 U.S.C. § 1983, Norma Gales sued the Dis-

trict of Columbia, the D.C. Metropolitan Police Department ("MPD"), and several MPD officers. She alleged that several officers, without probable cause, wrongfully or recklessly obtained a warrant for an address that did not exist; that they and other officers unreasonably relied on that warrant to search her home; and that the officers used excessive force and continued their search after realizing that her address was not the address stated on the face of the warrant. Gales also brought common law claims of negligence, battery, and false imprisonment. On March 31, 1999, after considering the parties' cross-motions for summary judgment, I issued an order granting the defendants' motion for summary judgment ·and denying the plaintiff's. This memorandum states the reasons for that order.

*Background*

There is no dispute that, on March 27, 1997, several MPD officers searched Ms. Gales' home at 1152 Sursum Corda Court, N.W., using a warrant to search 1152 First Terrace, N.W., an address that did not exist. The following facts are also undisputed:

On March 25, 1997, in the course of a murder investigation that had focused on one David Quincy Black, Detective Jeffrey Mayberry applied to a judge of the D.C. Superior Court for a warrant to search 1101 First Terrace, N.W. The application described the premises:

> THREE LEVEL BROWN BRICK DUPLEX HOUSE WITH THE NUMBERS 1101 ABOVE THE FRONT DOOR. THE FRONT DOOR IS WHITE WITH A PEEPHOLE AND A SILVER MAIL SLOT IN THE DOOR AND THERE IS A BROWN WOODEN STICK IN THE FIRST FLOOR WINDOW. ACCORDING TO THE RECORDS OF THE MPDC, DEPARTMENT OF MOTOR VEHICLES AND THE BAIL AGENCY [sic] IS THE ADDRESS OF DAVID QUINCY BLACK.

Pl.'s Oppos.Mem., Ex. 23 at 2 (Warrant Affidavit dated Mar. 25, 1997). The "records of the MPDC" is a reference to the Washington Area Law Enforcement System ("WALES"), a computerized database. WALES did list 1101 First Terrace as David Black's primary address, but it also listed 1152 First Terrace and two other addresses. Having seen that address on the WALES printout, Det. Mayberry did not further verify it before asking Officer Roger Venzin to obtain a description of the premises the next day. Mayberry Aff. at 41.

Officer Venzin had been assigned to the First District for about five years and was "familiar" with the Sursum Corda area.[1] Def.'s Mot.Summ.J., Ex. 23 (Venzin Aff.) at 1; Mayberry Aff. at 57; Fox Aff. at 12. On March 27, 1997, approaching from "L" Place, Officer Venzin drove to a parking lot on First Terrace. From there he proceeded on foot and identified what he thought was 1152 First Terrace. He did not see a sign for Sursum Corda Court or any other street. Officer Venzin's description of these premises—which turned out to be Ms. Gales' home—was the basis for information Det. Mayberry gave to Det. Middleton, who applied for a search warrant:

> It is requested that a District of Columbia Search Warrant be issued for the entire premises located at 1152—1st Terrace Northwest, which is described as a three level brown brick duplex building, with the numbers 1152 above the doorin [sic] brick. The front door is metal and gray in color. The defendant stated when he was arrested, that this was his home address.

Def.'s Mot.Summ.J., Ex. 5 at 2 (Warrant Affidavit dated Mar. 27, 1997) ("Middleton's Affidavit"). The application did not

---

1.  MPD supervisors know that the area around Gales' apartment is potentially confusing. Most officers newly assigned to the area are issued a map. "Sursum Corda Court is a puzzle. It always has been a puzzle." Pl.'s Oppos.Mem. at 19 (quoting Lt. Rodney Parks).

mention the earlier warrant application for 1101 First Terrace. It was submitted to, and approved by, the same Superior Court judge who had issued the warrant for 1101 First Terrace. Both warrants authorized police to search for physical evidence linking Mr. Black to the crime—a dark coat, jeans, 9 mm pistol and ammunition. Pl.'s Oppos.Mem., Ex. 23 at 1 (Search Warrant for 1101 First Terrace, dated 25 Mar. 1997); Def.'s Mot.Summ.J., Ex. 5 (Search Warrant for 1152 First Terrace, dated 27 Mar. 1997).

Officer Venzin led the warrant execution team to the house he had earlier identified and described as 1152 First Terrace. It was actually 1152 Sursum Corda Court, the home of Ms. Gales. The door was slightly ajar because an extension cord was in the doorway. Detective Middleton opened the door, banged on it and announced, at least three times, "Search warrant; get on the floor." Gales Depos. at 40. Ms. Gales was standing near the door. She remained standing and laughed at Middleton's command, "because she didn't know what was going on." *Id.* Another officer then approached Ms. Gales with his pistol drawn and told her twice to get on the floor. *Id.* at 44–46. When this second officer reached Ms. Gales, who was still standing, he "snatched [Ms. Gales'] left arm and put it behind [her], put his knee in [her] back, and shoved [her] to the floor, and then put plastic cuffs on [her]." *Id.* at 46.

Within one minute after Ms. Gales was placed on the floor, another officer asked her for her name and address. *Id.* at 48, 51–53. Upon hearing Gales say she lived at 1152 Sursum Corda Court, the officer asked twice whether the address was not actually 1152 First Terrace. *Id.* 53–55. Suspecting that the officers were searching the wrong house, Ms. Gales asked the officers for a search warrant. She was told that one would arrive later. *Id.* at 57–58. She offered the police no documentation to prove that her address was Sursum Corda Court. Gales Depos. at 64. Early

in the search, the police found "a gym-type bag with live ammunition and between 200–300 small zip lock baggies." Def.'s Mot.Summ.J., Ex. 10, Parks Aff. at 2. Lieutenant Parks, based on his experience, "knew the baggies were of the type which are commonly used to package illegal drugs for distribution in the District of Columbia." *Id.* The ammunition found was five bullets-four for a .32 caliber weapon, and one for a .22 caliber weapon.

The length of the search is disputed, as is the question whether the police continued to search after they realized that they were at the wrong address. It is undisputed, however, that Ms. Gales was handcuffed for less than thirty minutes, and that she was not harassed during this time. Gales Depos. at 63, 95. The police maintain that any searching conducted after discovery of the mistaken address was for the officers' safety.

Ms. Gales' complaint named the District, the MPD, Lieutenant Rodney Parks, Detective Jacqueline Middleton, Detective Jeffery A. Mayberry, Captain Alan Dreher, Officer Venzin, Officer Fox, and "certain unnamed individual police officers and employees of the [MPD], Jane and John Does One Through Ten." Amended Complaint ¶ 1. It alleged permanent physical injuries, pain and suffering, humiliation, medical costs and expenses, lost income, impairment of earning capacity, and property damage. Amended Complaint ¶ 42; Def.Mot.Summ.J., Ex. 24 at 1. The record contains no evidence to support Ms. Gales' claim of musculo-skeletal injuries to her neck and left arm.

*Analysis*

▮▮▮ The § 1983 claims against defendants named in their individual capacities will be barred by the defense of qualified immunity if a reasonable officer could have believed, in light of clearly established law and the information they possessed, that their actions were lawful. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The reasonableness standard is an objective one. *Harlow*

*v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Fludd v. United States,* 771 F.2d 549, 552–53 (D.C.Cir.1985). Qualified immunity issues ordinarily should be resolved before trial, *Hunter,* 502 U.S. at 228, 112 S.Ct. 534, and, where possible, before extensive discovery. *Fludd,* 771 F.2d at 553. The issue of qualified immunity is normally decided as a matter of law.

Plaintiff's resistance to the qualified immunity defenses interposed in this action center on Det. Mayberry, who allegedly caused the 1152 First Terrace warrant to be obtained without probable cause or intentionally or recklessly omitted material information from the warrant application, and on the warrant execution team, whose members allegedly relied unreasonably on the 1152 First Terrace warrant, used excessive force against Ms. Gales, and/or unlawfully continued to search after realizing that they were not at 1152 First Terrace.

### A.  *The warrant application*

■ If the application Det. Mayberry caused Det. Middleton to file was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *United States v. Salamanca,* 990 F.2d 629, 634 (D.C.Cir.1993) (citing *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)), then Det. Mayberry is not entitled to qualified immunity. I find, however, that the application was not lacking in indicia of probable cause: David Black's own statement was corroborated by the WALES printout, and Officer Venzin provided a description of the property confirmed by a personal visit. The application was objectively reasonable.

Ms. Gales goes on to argue, however, that the warrant would not have been approved had it included information, available to Det. Mayberry, that David Black

had been associated with three *other* addresses. In other words, Ms. Gales claims, Det. Mayberry intentionally or recklessly omitted facts that would have undermined probable cause. Pl.'s Oppos. at 3 n. 4. *See Washington v. D.C.,* 685 F.Supp. 264, 270 (D.D.C.1988) (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). To prevail against the motion for summary judgment on this claim, Ms. Gales had to produce evidence substantially demonstrating Det. Mayberry's deliberate falsehood or reckless disregard *and then* establish that inclusion of the omitted information would have prevented the warrant's approval. *See Hervey v. Estes,* 65 F.3d 784, 789 (9th Cir.1995). Ms. Gales has not made such a showing. The inclusion of the omitted information in Det. Middleton's affidavit would not have prevented *all* reasonably competent police officers from believing that there was probable cause to search 1152 First Terrace. *See Cartier v. Lussier,* 955 F.2d 841, 845–46 (2d Cir.1992); 1B Martin Schwartz & John Kirklin, *Section 1983 Litigation: Claims and Defenses,* § 9.26 at 446–47 (1998).[2]

### B.  *Warrant execution*

■ The officers have qualified immunity for executing the search warrant because they reasonably believed it to be a facially valid warrant obtained by fellow officers. *See Salmon v. Schwarz,* 948 F.2d 1131, 1140–41 (10th Cir.1991); Schwartz & Kirklin, *supra* § 9.27 at 454–55 ("[E]xecution of a facially valid warrant is objectively reasonable conduct."). There is no evidence in the record that any of the officers actually knew or should have known that the warrant was not supported by probable cause. *Cf. Juriss v. McGowan,* 957 F.2d 345, 351 (7th Cir.1992).

■ The claim that the officers used excessive force during the search is gov-

---

**2.** Ms. Gales alleges that Det. Fox is also liable on this claim. To the extent that the claim against Det. Fox warranted consideration, it was dismissed for the same reasons that the claim against Det. Mayberry was dismissed.

erned by *Scott v. District of Columbia*, 101 F.3d 748, 759 (D.C.Cir.1996). Here, the relevant inquiry is whether the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* The *Scott* case involved the efforts of several police officers to prevent the plaintiff, an apparently intoxicated off-duty officer, from escaping. The plaintiff was punched by one officer and then tackled by several others, some of whom pinned the plaintiff to the ground with their knees. The D.C. Circuit noted that officers must be given the benefit of the doubt in "a quickly developing situation" and that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Scott*, 101 F.3d at 759–60 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In the instant case, Ms. Gales admits that she failed to obey at least five separate orders, by officers who identified themselves as law enforcement agents, to get down on the floor. Gales Depos. at 40. It is taken as true for purposes of this motion that an officer put Ms. Gales' arm behind her, shoved her to the floor, and then used a knee to keep her there. In the context of a search for a murder weapon, this degree of force was not "so excessive that no reasonable officer could have believed in the lawfulness of his actions." *Scott*, 101 F.3d at 759.

■ Ms. Gales' claim that the police unreasonably continued their search after realizing they realized they were not at 1152 First Terrace also fails. as a matter of law. Early in their search, the officers discovered 200–300 plastic bags of the type often used to package drugs and several .32 and .22 caliber bullets. Those items provided an independent basis for probable cause to search, or at the very least to complete a protective sweep of the premises.

## C. Liability of District of Columbia, Capt. Dreher and Lt. Parks

■ Ms. Gales' claim against the MPD, a municipal department of the District, was dismissed because agencies and departments within the District of Columbia government are not suable as separate entities. *Fields v. District of Columbia Department of Corrections*, 789 F.Supp. 20, 22 (D.D.C.1992). .

■ Ms. Gales' amended complaint implied a claim of constitutional injury resulting from the District's failure to properly train and supervise its officers. Amended Complaint, Count 2, ¶¶ 52–66. The District of Columbia may not be held liable in a § 1983 suit under principles of respondeat superior, but it could be liable for constitutional torts arising from "action pursuant to official municipal policy," *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C.Cir.1997), if plaintiff could "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C.Cir.1986). Ms. Gales had the burden of producing evidence on this point and failed to do so. "One instance, however egregious, does not a pattern or practice make." *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C.Cir.1987). Ms. Gales' suggestion that Capt. Dreher's replacement demonstrates that the First Division's Homicide Unit was in complete "disarray" when the search of Gales' residence occurred amounts only to a "minute fragment[ ] of evidence" that is insufficient to demonstrate a "genuine" issue of material fact. *See Jackson v. District of Columbia*, 672 F.Supp. 22, 25 (D.D.C.1987).

■ The claims against Capt. Dreher and Lt. Parks failed because Ms. Gales demonstrated no connection between their alleged lack of supervision and the constitutional harm she alleged. "It is well settled that the doctrine of respondeat superior may not be employed to impose § 1983 liability on a supervisor for the conduct of a subordinate which violates a citizen's

constitutional rights." *Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 263 (3rd Cir.1995). Ms. Gales produced no evidence that Capt. Dreher or Lt. Parks either violated her Fourth Amendment rights by their own conduct or that they knew and approved of unlawful conduct by others. *See St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir.1994).

The remaining common law claims were dismissed on the authority of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).